## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Tamail Williford and | § | |
| Steve Darnell Williford, Sr., Individually, | § | |
| and as Next Friends to Z.N.W., a minor | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | **Civil Action No. 4:17-cv-3002** |
| | § | |
| General Motors LLC, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' COMPLAINT

**To the Honorable United States Judge of Said Court:**

COMES NOW, Tamail Williford and Steve Darnell Williford, Sr., Individually and as Next Friends to Z.N.W., a minor (hereinafter referred to as "Plaintiffs"), and respectfully file this Complaint against General Motors LLC (hereinafter referred to as "Defendant"), and in support hereof would state and show the following:

## I. Parties

1.   Plaintiff Tamail Williford and Steve Darnell Williford, Sr. are married, and the biological parents of Steve Darnell Williford, Jr., deceased.  They reside in and are a citizens of Bryan, Texas.

2.   Z.N.W., a minor, is the surviving daughter of Steve Darnell Williford, Jr.  She resides in and is a citizen of Bryan, Texas. She appears in this action through her

Next Friends, Tamail Williford and Steve Darnell Williford, Sr., who are her legal guardians and biological grandparents.

3.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business in Michigan. Its sole member is General Motors Holdings LLC, a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in the Michigan. Service of process upon this Defendant may be had by serving its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234.

## II. Jurisdiction

4.     This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

5.     The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## III. Facts

6.     On or about May 2, 2017, Steve Darnell Williford, Jr. was driving a 2006 Chevrolet Malibu (VIN# 1G1ZS51F56F103852) traveling northbound on the west Feeder Road of US 190 in Brazos County, Texas.

7.     The subject vehicle was designed by Defendant.

8.     The subject vehicle was manufactured by Defendant.

9.     The subject vehicle was also assembled and tested by Defendant.

10.  A southbound vehicle on the west Feeder Road of US 190 crossed over into the northbound lane, striking the subject vehicle that Steve Darnell Williford, Jr. was operating.

11.  At the time of the accident, Steve Darnell Williford, Jr. was properly seated and properly wearing the available seat belt.

12.  However, despite being properly seated and wearing the available 3-point seat belt, Steve Darnell Williford, Jr. sustained fatal injuries during the accident when the vehicle failed to protect him because it violated several crashworthiness principles.

13.  There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1.  Maintain survival space;

    2.  Provide proper restraint throughout the entire accident;

    3.  Prevent ejection;

    4.  Distribute and channel energy; and

    5.  Prevent post-crash fires.

14.  When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

15. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

16. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

17. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

18. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

19. General Motors has stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

20. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

21. Because every American has the right to a safe vehicle, because safety is for

all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

22.   It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

23.   In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

24.   This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

25.   Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers

have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

26.   Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

27.   Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

28.   Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

29.   Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in

mandatory standards, rules, and/or regulations.

## IV. Cause(s) of Action as to Defendant

30.   It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

31.   The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly fore-seeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

32.   Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

33.   As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

34.   Defendant either knew or should have known of at least one safer alternative design which would have prevented the fatal injuries to Steve Darnell Williford, Jr.

35.   In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that

the vehicle was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

    a.   The vehicle failed to provide proper restraint;

    b.   The vehicle failed to provide proper protection in narrow, frontal offset, moderate offset, or oblique/angled impacts;

    c.   The vehicle failed to utilize UHSS, AHSS, boron, martensite, ferrite, complex phase, dual phase or TRIP steel in the following areas: safety cage, cross bar, underbody, header, pillars, side rails, cant rails, door ring, occupant compartment zone, occupant survival space;

    d.   The vehicle failed to utilize MPa rated steel in the safety cage of at least 1100;

    e.   The vehicle failed to properly channel, distribute, and dissipate crash forces away from the safety cage;

    f.   The vehicle failed to maintain the survival space;

    g.   The vehicle failed to provide reasonable occupant protection;

    h.   The vehicle lacked safer alternative designs that other vehicle that cost even less utilized;

    i.   The vehicle violated principles of crashworthiness; and/or

    j.   The vehicle lacked ESC.

36. Defendant was further negligent in the manufacture, assembly, marketing, and/or testing of the vehicle in question.

37. Defendant failed to conduct proper testing and engineering analysis during the design, development, and/or testing of the vehicle.

38. The vehicle was not properly subjected to narrow, moderate, and/or oblique frontal offset testing.

39. The vehicle was not subjected to crash testing with occupants in the front and rear seats.

40. The vehicle was not subjected to rigorous engineering analysis.

41.   In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

42.   Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

43.   If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

44.   If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

45.   A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

46.   Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

47.   Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

48.   When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicle. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

49.   Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

50.   However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

51.   Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendant knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

52.   The foregoing acts and/or omissions, defects, and/or negligence of Defendant were the producing, direct, proximate, and/or legal cause of Steve Darnell Williford, Jr.'s fatal injuries and Plaintiffs' damages.

## V. Damages to Plaintiffs

53.   Plaintiffs seek recovery for all available damages under any applicable statute and/or common law of the state of Texas.

54.   As a result of the acts and/or omissions of Defendant, Plaintiffs have suffered past and future; loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, loss of companionship and society, loss of consortium, and mental anguish as a result of the death of Steve Darnell Williford, Jr.

55.   As a result of the acts and/or omissions of Defendant, Plaintiffs have become obligated to pay reasonable and necessary funeral, and burial expenses as a result of

the fatal injuries to Steve Darnell Williford, Jr.

56.   The above and foregoing acts and/or omissions of the Defendant, resulting in the fatal injuries to Steve Darnell Williford, Jr., have caused actual damages to Plaintiffs in excess of the minimum jurisdictional limits of this Court.

## VI. Prayer

57.   For the reasons presented herein, Plaintiffs pray that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against Defendant for:

   a.   actual damages;
   b.   economic and non-economic damages;
   c.   prejudgment and post-judgment interest beginning May 2, 2017;
   d.   costs of suit; and
   e.   all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**


  /s E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
EToddTracy@vehiclesafetyfirm.com
Stewart D. Matthews
State Bar No. 24039042
SMatthews@vehiclesafetyfirm.com
Andrew G. Counts
State Bar No. 24036408
ACounts@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas  75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**